**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Case No. 11-CR-750-2 |
| v. | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| SAUL MELERO | ) | |

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant Saul Melero's consolidated motion [222] for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure and for judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure. For the following reasons, the motion [222] is denied.

### I.  Background

The factual predicate for this order is set forth in detail in the Court's order denying Melero's motion to suppress certain evidence, [110], and the Court's orders denying Melero's motions for reconsideration of the suppression ruling, [137], [172]. Knowledge of those orders is assumed here. Melero was charged with possession with intent to distribute 1 kilogram or more of heroin, 500 grams or more of cocaine, and a measurable amount of marijuana in violation of 21 U.S.C. § 841(a)(1) (Count One); managing or controlling a place used for the purpose of unlawfully manufacturing and storing controlled substances in violation of 21 U.S.C. § 856(a)(2) (Count Two); knowingly possessing a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A) (Count Three); and possession of a firearm by a felon in violation of 18 U.S.C. § 922(g)(1) (Count Four).[1]

---

[1] To avoid confusion, this opinion refers to the count numbering used in the jury's verdict form, rather than the numbering used in the indictment. See [207], [217].

On October 16, 2015, a jury found Melero guilty on Counts One and Two and not guilty on Counts Three and Four. On November 30, 2015, Melero filed his consolidated motion for new trial and for judgment of acquittal. See [222]; see also [236] (Government's response); [237] (Melero's reply).

## II. Analysis

### A. Motion for New Trial

"Federal Rule of Criminal Procedure 33(a) gives district courts the discretion to grant a new trial 'if the interest of justice so requires.'" *United States v. Hagler*, 700 F.3d 1091, 1101 (7th Cir. 2012) (quoting Fed. R. Crim. P. 33(a)). "'[A] jury verdict in a criminal case is not to be overturned lightly, and therefore a Rule 33 motion is not to be granted lightly.'" *United States v. Betts-Gaston*, 2015 WL 6859165, at *8 (N.D. Ill. Nov. 6, 2015) (quoting *United States v. Santos*, 20 F.3d 280, 285 (7th Cir. 1994)). Instead, Rule 33(a) is "'reserved for only the most extreme cases.'" *Hagler*, 700 F.3d at 1101 (quoting *United States v. Linwood,* 142 F.3d 418, 422 (7th Cir. 1998)). "[C]ourts have interpreted the rule to require a new trial 'in the interests of justice' in a variety of situations in which the substantial rights of the defendant have been jeopardized by errors or omissions during trial." *United States v. Kuzniar*, 881 F.2d 466, 470 (7th Cir. 1989). New trials have "been granted 'in the interests of justice' where evidence was erroneously permitted to go to the jury, substantially affecting the rights of the accused." *Id*.

### 1. Standing

In this case, Melero argues that he is entitled to a new trial because the Court erroneously admitted evidence—including drugs, drug manufacturing and packaging supplies, and a gun recovered from the bedroom of Unit 702 of 1819 Michigan Ave.—that was obtained in violation of his Fourth Amendment rights. A threshold issue raised by the parties' briefs is whether

Melero has a right to challenge the Government's seizure of evidence from his co-defendant Jason Correa ("Correa"). The Government argues that Melero "has no standing" to challenge "the Court's ruling on the traffic stop of Correa, the agent's seizure of the keys and garage door openers from Correa, [or] the validity of Correa's consent to search the condo." [236] at 7. Melero responds that a defendant always has standing to challenge the validity of third party consent to search premises in which the defendant has a privacy interest—in this case, Correa's consent to search Unit 702, which was rented by Melero. According to Melero, Correa's consent to search the apartment was not voluntary because the consent was dependent on prior Fourth Amendment violations—namely, the illegal detention of Correa's automobile, illegal confiscation of keys and a garage door opener from the car, and illegal use of the keys and opener to locate the apartment. [237] at 2, 4. Melero also argues that he has standing to contest the seizure of keys and key fobs from Correa because the "beeper and keys seized by the government were an effect belonging to Mr. Melero." [237] at 6.

The Court concludes that Melero does have a right to challenge the Government's search and seizure of evidence from Unit 702. "A third party may give consent to search a place in which both [he] and the defendant have legitimate expectations of privacy, and the defendant can challenge the validity of the consent given by the third party." *United States v. Cellitti*, 387 F.3d 618, 621 (7th Cir. 2004). The "relevant inquiry" is whether the "privacy interests" of the person challenging the search "were violated by the search." *Id.* Melero asserts that he had a privacy interest in Unit 702 and the Government does not challenge this point. See *id.* at 622 (defendant had standing to challenge consent to search of automobile, owned by defendant's fiancee but in which defendant had legitimate expectation of privacy, regardless of fact that it was fiancee, not defendant, who consented to search); *United States v. Marrocco*, 578 F.3d 627, 631 n.4 (7th Cir.

2009) (owner of locked briefcase had reasonable expectation of privacy in its contents, and thus had standing to challenge search and detention of briefcase, even though he entrusted briefcase to care of another).

### 2. Merits

Turning to the merits, Melero argues that Correa's consent to search Unit 702 was not voluntary because it was tainted by: (1) the traffic stop of Correa, which was conducted by an officer operating outside of his jurisdiction and not supported by probable cause or reasonable suspicion; (2) the seizure of keys and key fobs discovered during the search of the car Correa was driving, which was not supported by probable cause; and (3) law enforcement's use of the keys and garage door opener to conduct warrantless searches of the garage, entryway, and mailbox of 1819 Michigan Ave. and to locate Unit 702. Melero also argues that law enforcement's unconstitutional use of the keys and garage door opener did not fall under the good faith exception to the exclusionary rule. Melero made the same arguments in his pre-trial motion to suppress [75], motion for reconsideration [137], and renewed motion for reconsideration [149]. The Court thoroughly considered and rejected all of these arguments. See [110], [137], [172].

Melero fails to convince the Court that its prior decisions were wrong. First, Officer Giorgetti had probable cause to pull Correa over based on his personal observation of Correa committing a traffic violation by failing to signal a left turn. See [110] at 5. Melero argues in his motion for a new trial that two facts "fatally undermine" Officer Giorgetti's testimony that Correa failed to signal his left turn: (1) no other law enforcement officer observed the traffic violation; and (2) Officer Giorgetti did not detain Correa's vehicle until half a mile away from the site of the alleged traffic violation. [222] at 7. The Court is not convinced that these facts

undermine Officer Giorgetti's testimony. The only other officer following Correa was Officer Hollister. Officer Hollister was trailing behind Officer Giorgetti. Melero has presented no evidence that Officer Hollister, from where his car was positioned, would have been able to see Correa's turn signal when he turned off of Canal Street on to 18th Street. Officer Hollister also testified that he heard Officer Giorgetti announce Correa's traffic violation in real time over DEA radio, which is consistent with Officer Giorgetti's testimony. Melero does not explain why half a mile was an unreasonably long distance to follow Correa from the site of his alleged illegal left turn, or why the length of the drive undermines Giorgetti's testimony that Correa committed a traffic violation.

Further, the Court is not convinced that Officer Giorgetti, as a Willow Springs police officer, lacked authority under Illinois law to stop Correa in Chicago for a traffic violation. Pursuant to Illinois statute, "[a]ny person may arrest another when he has reasonable grounds to believe that an offense other than an ordinance violation is being committed." 725 Ill. Comp. Stat. Ann. 5/107-3. "It is well established that a peace officer outside his or her jurisdiction may use section 107–3 as a basis for making an arrest." *People v. Kleutgen*, 833 N.E.2d 416, 419 (Ill. App. 2005). The Illinois Vehicle Code requires the use of turn signals. See 625 Ill. Comp. Stat. Ann. 5/11-804(b). Officer Giorgetti's personal observation of Correa turning left without using a turn signal gave him probable cause to stop Correa for a traffic violation. See *United States v. Kenerson*, 585 F.3d 389, 391-92 (7th Cir. 2009) (police officer had probable cause to make traffic stop after observing defendant fail to activate his turn signal until five feet before turning in violation of Illinois Vehicle Code).

Melero argues that Giorgetti's use of his squad car lights to pull over Correa rendered the detention invalid under Illinois' citizen's arrest statute, 725 Ill. Comp. Stat. Ann. 5/107-3.

However, "[a] police officer acting outside his jurisdiction is not prohibited from acting under color of his office to effect a valid citizen's arrest." *People v. Shick*, 744 N.E.2d 858, 864 (Ill. App. 2001) (extraterritorial traffic stop by police officer acting as a private citizen was not rendered invalid by his use of a radio to communicate his location to the police dispatcher, or by the use of his mars lights, spotlight, or gun). "[A]n arrest under section 107–3 becomes improper only if an out-of-jurisdiction officer used the powers or equipment [to] collect the evidence that justified the arrest." *Kleutgen*, 833 N.E.2d at 420. Here, the evidence that justified Correa's detention for a traffic violation was Giorgetti's observation of Correa turning without a turn signal—evidence that would be available to any private citizen. During the stop, Melero consented to a search of his vehicle. Cf. *United States v. Taylor*, 596 F.3d 373, 376 (7th Cir. 2010) ("even when officers have no basis for suspecting a particular individual of criminal activity, they can generally ask questions of that person and request consent for a search"). At that point, the officers discovered the grocery bag of narcotics, which gave them probable cause to arrest Correa under both state and federal law. See 720 ILCS 570/100 *et seq.* (Illinois Controlled Substances Act); 21 U.S.C. § 878(a)(3) (authorizing DEA officers and employees to "make arrests without warrant (A) for any offense against the United States committed in his presence, or (B) for any felony, cognizable under the laws of the United States, if he has probable cause to believe that the person to be arrested has committed or is committing a felony").

Moreover, even assuming for the sake of argument that Officer Giorgetti was operating outside his territorial jurisdiction under Illinois law when he pulled over Correa, any misapprehension of the scope of his authority to effectuate a traffic stop or an arrest would not rise to the level of a Fourth Amendment violation on the facts present here. "Under the

exclusionary rule, evidence seized in violation of the Fourth Amendment must be suppressed." *Gentry v. Sevier*, 597 F.3d 838, 850 (7th Cir. 2010). But the exclusionary rule "does not extend to violations of statutes and regulations." *United States v. Procknow*, 784 F.3d 421, 429 (7th Cir. 2015); see also *Pasiewicz v. Lake Cty. Forest Pres. Dist.*, 270 F.3d 520, 526 (7th Cir. 2001) ("The federal government is not the enforcer of state law."); *Kraushaar v. Flanigan*, 45 F.3d 1040, 1047-48 (7th Cir. 1995) ("[P]laintiffs cannot rely upon provisions of state law to determine what conduct is reasonable under the federal Constitution."). Thus, "an officer can act incorrectly with regard to his jurisdiction just as he can act incorrectly with regard to any other factor involved in the exercise of his authority." *Pasiewicz*, 270 F.3d at 527. And when an officer acts outside of his jurisdiction, there is no hard and fast rule on the constitutionality of his actions. Rather, the "ultimate touchstone" of the Fourth Amendment analysis remains "reasonableness" in all of the circumstances. *Riley v. California*, 134 S. Ct. 2473, 2482 (2014) (quoting *Brigham City v. Stuart,* 547 U.S. 398, 403 (2006)); see also *Whren v. United States*, 517 U.S. 806, 815 (1996) (holding that police officers acted reasonably for purposes of the Fourth Amendment by temporarily detaining motorist for a civil traffic violation, even though officers' actions violated District of Columbia regulations limiting the authority of plainclothes officers in unmarked vehicles, where officers had probable cause to believe a traffic violation had occurred).

The Seventh Circuit has opined that an officer's violation of a state statute that limits his territorial jurisdiction may violate the Fourth Amendment if, for instance, the officer "knew [he] lacked jurisdiction" or officers in the jurisdiction in which the arrest occurred "specifically prohibited the * * * officer[] from arresting [the defendant] within their jurisdiction." *Pasiewicz*, 270 F.3d at 527. "Such a blatant disregard of state law and the chain of command could weigh

on the scales of reasonableness." *Id.* Absent such aggravating circumstances, however, courts generally have held that arrests made by local law enforcement officers acting outside their jurisdictions do not violate the Fourth Amendment. *Id.* Since the Seventh Circuit decided *Pasiewicz*, the Supreme Court has further clarified that the constitutionality of a search or seizure for purposes of the Fourth Amendment does not depend on the legality of the arrest under state law. See *Virginia v. Moore*, 553 U.S. 164, 176 (2008). In *Moore*, the Court held that Virginia police officers did not violate the Fourth Amendment by arresting a motorist whom they had probable cause to believe had violated Virginia law by driving with a suspended license, even though, as matter of Virginia law, the officers should have issued a summons rather than made an arrest. *Id.* The Court explained that "when an officer has probable cause to believe a person committed even a minor crime in his presence, the balancing of private and public interests is not in doubt" and "[t]he arrest is constitutionally reasonable." *Id.* at 171. According to the Court, it is "obvious that the Fourth Amendment's meaning did not change with local law enforcement practices—even practices set by rule." *Id.* at 172. "While those practices [v]ary from place to place and from time to time,' Fourth Amendment protections are not 'so variable' and cannot 'be made to turn upon such trivialities.'" *Id.* (quoting *Whren*, 517 U.S. at 815).

In this case, Melero has presented no evidence that Officer Giorgetti's decision to stop Correa in Chicago was unreasonable for purposes of the Fourth Amendment. Most importantly, Officer Giorgetti had probable cause to pull Correa over based on his personal observation of Correa committing a traffic violation by failing to signal a left turn. See [110] at 5; see also *Moore*, 533 U.S. at 176. Moreover, Officer Giorgetti was not a rogue officer operating in willful ignorance of his boundaries or specific prohibitions on his actions. To the contrary, he was working as a sworn Task Force Officer for the DEA and following the instructions of a federal

agent who was coordinating an investigation involving federal and state officers and was working with a federal prosecutor on the investigation. See [110] at 1. Specifically, DEA Special Agent Asselborn instructed Giorgetti and his fellow task force officer Steve Hollister to initiate a traffic stop if they observed probable cause to make one. *Id.* at 2-3. Giorgetti credibly testified at the suppression hearing that he believed he had authority to conduct a traffic stop in Chicago. There is no evidence that any officers who had jurisdiction in Chicago prohibited Giorgetti from making traffic stops in the City. Under these circumstances, the Court concludes that Melero's Fourth Amendment rights were not violated and Melero is not entitled to a new trial on the basis of Officer Giorgetti's alleged lack of territorial jurisdiction to make the traffic stop. Cf. *Pasiewicz*, 270 F.3d at 526-27 (even assuming that county forest preserve police officers violated state statutes governing officers' jurisdiction by arresting defendant outside preserve, arrest by itself did not give rise to § 1983 cause of action for violation of Fourth Amendment, absent showing that it was made in blatant disregard of state law and thus unreasonable); *United States v. Janik*, 723 F.2d 537, 548 (7th Cir. 1983) (observing that "[s]tate and federal officers in Illinois often work together on apprehending persons suspected of federal crimes, yet we know of no case where a court invalidated an arrest, or suppressed evidence obtained at the time of an arrest, of such a person by an Illinois officer without a warrant").

The Court further concludes that, regardless of whether Officer Giorgetti had authority under Illinois law to detain Correa for a traffic violation, Officer Giorgetti had a reasonably articulable suspicion that Correa had engaged in a drug transaction and therefore did not violate the Fourth Amendment by subjecting Correa to a *Terry* stop while working as a DEA task force agent. See [110] at 7-8. "The Supreme Court has made clear that an investigatory stop, which constitutes only a limited intrusion into an individual's privacy, is reasonable, and therefore

permissible, if the officer making the stop is 'able to point to specific and articulable facts' that give rise to a reasonable suspicion of criminal activity." *United States v. Mays*, No. 15-2152, --- F.3d ---, 2016 WL 1399459, at *3 (7th Cir. Apr. 11, 2016) (quoting *Terry v. Ohio,* 392 U.S. 1, 21–22 (1968)). "When determining whether an officer had reasonable suspicion, courts examine the totality of the circumstances known to the officer at the time of the stop, including the experience of the officer and the behavior and characteristics of the suspect." *United States v. Lawshea*, 461 F.3d 857, 859 (7th Cir. 2006). This assessment requires that the court engage in an objective analysis that is "'based on common-sensical judgments and inferences about human behavior.'" *United States v. Baskin*, 401 F.3d 788, 791 (7th Cir. 2005) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000)). The constitutionality of the stop does not depend on "the actual motivations of the individual officers involved." *Whren*, 517 U.S. at 813; see also *United States v. Taylor*, 596 F.3d 373, 377 (7th Cir. 2010) ("Taylor's argument * * * that the traffic stop was a pretext for a drug investigation, and that the primary objective is relevant in determining the reasonableness of a search and seizure * * * has been repeatedly rejected by the Supreme Court.").

Melero argues that Correa's activities on October 27, 2011 "did not give rise to reasonable suspicion" of criminal activity, because all officers saw was "that after talking to another individual at a grocery store (or adjacent Starbucks) [Correa] took a plastic bag (of the type commonly used to house groceries or other products purchased from a grocery store) from an individual that law enforcement believed to be involved in drug trafficking, based on an event that occurred a week prior and involving other individuals." [222] at 8. But Melero omits key facts also known to law enforcement at the time of Correa's detention and arrest: The person Correa met in the grocery store parking lot was the same person (unidentified male 2, or "UM2")

whom officers had observed engaging in a suspected $500,000 drug transaction eight days earlier following a similarly brief meeting at a restaurant. On that day, DEA agents observed a confidential source ("CS") meet with UM2 and unidentified male 1 ("UM1") inside a restaurant at 53rd and Pulaski in Chicago. UM1 and UM2 drove a red GMC Canyon truck to the meeting. After the meeting, UM1 and UM2 swapped vehicles with CS. Agents followed UM1 and UM2 and watched them enter a parking garage near 18th and South Prairie in Chicago. The agents suspected that 1717 South Prairie was a stash house. Twenty five minutes later, agents saw UM1 and UM2 emerge from the parking garage attached to 1717 South Prairie and drive back to 53rd and Pulaski, where they again swapped cars with the CS. DEA met with the CS and discovered $500,000 that was not in his vehicle prior to the meeting with UM1 and UM2. Other agents followed UM1 and UM2 back to a residence in Lyons, Illinois.

Eight days later—the day Correa was arrested—DEA agents conducting surveillance observed UM2 emerge from the Lyons, Illinois residence driving the red GMC Canyon truck. UM2 drove to a grocery store located at Canal Street and Roosevelt Road in Chicago and parked in the parking lot. UM2 then met with Correa in a Starbucks in the grocery store. The two men then walked back to the Canyon and UM2 pulled out a multi-colored bag and handed it to Correa. Correa placed the bag in the rear passenger side of his Jeep and left the parking lot, heading South on Canal Street in the direction of the suspected stash house at 1717 South Prairie. *See id.* at 3, 7-8. When Correa was pulled over and consented to the search of his vehicle, officers discovered narcotics in the plastic bag. The Court concludes based on the totality of the circumstances known to Officer Giorgetti at the time of the stop, including his experience working as a DEA task force officer and the behavior of Correa, that Giorgetti's investigatory stop of Correa was based on specific and articulable facts that gave rise to reasonable suspicion

that Correa was engaging in an illegal drug transaction. Cf. *United States v. Roman*, 626 F. App'x 177, 180 (7th Cir. 2015) (collective-knowledge doctrine permitted police officers, upon direction from DEA investigators, to conduct *Terry* investigatory stop of defendant's vehicle, though defendant was not a named target of narcotics-trafficking investigation, where DEA investigators had listened to monitored telephone calls of pre-arranged heroin deal between confidential informant and third person and had surveilled the deal's locations, giving DEA investigators reasonable suspicion that defendant's car contained unsold heroin after drug deal had been called off).[2]

Melero's second argument in support of his motion for new trial is that law enforcement officers did not have probable cause to seize the keys and key fobs that were discovered during the search of Correa's vehicle, because "the keys at issue did not suggest any evidence of a crime." [222] at 10. Correa asserts that before the officers located and searched Unit 702, the keys "were simply innocuous common house or condo keys that any individual might, and nearly every individual does, use on a daily basis." *Id.* at 11. The Court is not persuaded by this argument. The typical individual does not carry around a bag of keys and garage door openers for his or her personal use. Indeed, Melero asserts in his reply brief that the police should have assumed that Correa "did *not* personally own all the properties to which those keys were attached" ([237] at 5, emphasis added), which supports the Government's position that agents suspected that the keys and openers were associated with stash houses. The Court concludes, as it did in its orders denying Melero's motions to suppress and for reconsideration,

---

[2] Melero argues that the fact that Correa drove toward the suspected stash house was actually exculpatory, because "[i]t would be an odd drug deal indeed wherein the seller left a stash house, and provided narcotics to a purchaser, only so that the purchaser could return the drugs to the same stash house." [222] at 9. However, the evidence does not show that Correa returned to the same stash house from which the alleged sellers came. UM2 came from the Lyons residence to the grocery store parking lot, and Correa went from the grocery store parking lot toward the 1717 Prairie residence.

that it was reasonable for Special Agent Asselborn to infer that the bag filled with an assortment of garage door openers, keys, and cell phones was evidence, especially given that the DEA was investigating Correa for suspected involvement in a drug and money laundering operation that involved the switching of cars and access to apartments where drugs or money are kept. See [110] at 10-11.

The final issue presented in Melero's motion for new trial is whether the good faith exception to the exclusionary rule applies to law enforcement's use of the garage door opener to locate 1819 S. Michigan and use of keys to identify the mailbox for Unit 702 and Unit 702 itself. In *Davis v. United States*, 564 U.S. 229 (2011), the Supreme Court held that evidence obtained in violation of the Fourth Amendment should not be suppressed "when the police conduct a search in objectively reasonable reliance on binding appellate precedent." *Id*. at 249-50. At the time of the search being challenged here, *United States v. Concepcion*, 942 F.2d 1170 (7th Cir. 1991), held that law enforcement officers did not violate the Fourth Amendment by using a defendant's keys to open the door to the common area of an apartment building, because "a tenant has no reasonable expectation of privacy in the common areas of an apartment building." *Id.* at 1172; see also *Harney v. City of Chicago*, 702 F.3d 916, 925 (7th Cir. 2012) ("Absent certain particular facts not alleged here, there is no reasonable expectation of privacy in common areas of multiple dwelling buildings."). *Concepcion* further provided that although the use of a defendant's apartment key in the apartment door lock constituted a search, the defendant's privacy interest in the lock was "so small that the officers do not need probable cause to inspect it" by placing the key in the lock and seeing if it opens. *Concepcion*, 942 F.2d at 1173. In addition, at the time search, *United States v. Knotts*, 460 U.S. 276 (1983), provided that law enforcement officers did not violate the Fourth Amendment by using a beeper to trace the movement of a drum of

chemicals (used to produce illegal drugs) through the streets, so long as the beeper was not used to reveal information about the movement of the drum inside the owner's cabin or "in any way that would not have been visible to the naked eye from outside the cabin."  *Id.* at 285.

*Concepcion* and *Knotts* specifically authorized law enforcement's actions in this case at the time that they were undertaken.  The Court agrees with the Government that, pursuant to *Concepion*, "it was very clear that the use of the key fob to enter the lobby, and the use of the garage door opener to identify Correa's building, were not searches because defendants did not have a reasonable expectation of privacy in the common areas like the lobby or the garage of a 10-floor, 60-80 condo unit building."  [236] at 10-11.  The Court also agrees that the use of the mail key and the front-door key to identify Correa's unit in the building were at most searches in the same way that the agents used a key in *Concepcion*.  As in *Concepion*, officers could have discovered where Melero lived in other ways, for instance by following him, looking him up in the phone book, or speaking with landlords of apartment buildings in the area to see if they knew Correa.  "The information the agents obtained from putting the key in the lock thus was no secret," and using a key to confirm Correa's address did not violate the Fourth Amendment. *Concepcion*, 942 F.2d at 1173.  Law enforcement's use of the garage door opener to locate 1819 S. Michigan also was authorized by *Knotts*, which recognized that monitoring beeper signals showing movement in a public place does not "invade any legitimate expectation of privacy." *Knotts*, 460 U.S. at 285.  While the facts are not identical to this case, there are enough similarities to clearly establish officers' right to use technology in a public place to locate premises suspected of criminal activity (but not to monitor activity *inside* the premises) without a warrant.  Finally, while the Seventh Circuit recently held in a case of first impression that "no appellate decision specifically authorizes the use of a super-sensitive instrument"—such as a

drug-detecting dog—'by the police outside an apartment door to investigate the *inside* of the apartment without a warrant," *United States v. Whitaker*, Nos. 14-3290 & 14-3506, 2016 WL 1426484, at *5 (7th Cir. Apr. 12, 2016) (emphasis added), that decision is inapplicable here because officers only used electronic instruments (the garage door opener and key fob) to locate Melero's apartment building, not to determine what was going on behind his closed apartment door.

For these reasons, the Court denies Melero's motion for a new trial.

### B. Motion for Judgment of Acquittal

Under Rule 29(a) of the Federal Rules of Criminal Procedure, at the close of the government's evidence or all of the evidence, the defendant may more for entry of a judgment of acquittal on "any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). A "Rule 29 judgment of acquittal is a substantive determination that the prosecution has failed to carry its burden." *Smith v. Massachusetts*, 543 U.S. 462, 468 (2005). The Court is allowed, as it did here, to reserve decision on a Rule 29(a) motion until after the jury returns a verdict of guilty. Fed. R. Crim. P. 29(b). The Court "must decide the motion on the basis of the evidence at the time the ruling was reserved," *id.*—in this case, at the close of all the evidence. See [204]. The Court construes the evidence "in the light most favorable to the government." *United States v. Weimert*, No. 15-2453, --- F.3d ---, 2016 WL 1395180, at *1 (7th Cir. Apr. 8, 2016). To prevail, Melero "must show that no rational trier of fact could have found that the government proved the essential elements of the crime beyond a reasonable doubt." *United States v. Griffin*, 684 F.3d 691, 694 (7th Cir. 2012); see also *United States v. Bell*, Nos. 14-3462 & 14-3470, 2016 WL 629524, at *8 (7th Cir. Feb. 17, 2016).

Melero argues that the evidence presented at trial was insufficient to permit a rational jury to find him guilty on Counts One and Two of the indictment. According to Melero, the Government relied solely on: (1) the proximity of the narcotics to other items purportedly belonging to Melero (such as his mail, a cancelled rent check, and marriage and birth certificates); and (2) Melero's fingerprints found on some of the plastic bags containing narcotics, which were recovered from the locked box in the locked apartment bedroom. Melero asserts that this evidence was insufficient to establish that he possessed the narcotics in the bedroom, as required for a conviction on Count One, or that he knew the drugs were present in the apartment, as required for a conviction on Count Two. Specifically, Melero argues that *Mikes v. Borg*, 947 F.2d 353 (9th Cir. 1991), entitles him to relief because the Government failed to meet its burden of showing that he had no access to the plastic bags prior to the time they contained drugs.

The Court concludes that Melero is not entitled to a judgment of acquittal on this basis, because the Government was not required to show that the bags were inaccessible to Melero before they contained narcotics. *Mikes*, a habeas case, is not binding in this Circuit and factually distinguishable in any event. In *Mikes*, the defendant was convicted of murder based solely on the presence of his fingerprints on three posts that made up a disassembled turnstile, including one post that was identified as the murder weapon. 947 F.2d at 356. The defendant's fingerprints were not found "anywhere on the premises" of the murder scene "except on the posts," and other unidentified fingerprints were also found on all three posts. *Id.* The Ninth Circuit recognized that "fingerprint evidence alone may under certain circumstances support a conviction" for murder. *Id.* However, the court explained, "in fingerprint-only cases in which the prosecution's theory is based on the premise that the defendant handled certain objects *while*

*committing the crime in question,* the record must contain sufficient evidence from which the trier of fact could reasonably infer that the fingerprints were in fact impressed at that time and not at some earlier date." *Id.* at 356-67.

Unlike *Mikes*, this was not a "fingerprints-only" case and the Government was not required to prove that Defendant physically handled all of the narcotics for which he was convicted of possessing. Because Defendant "was not caught actually holding or carrying the drugs," the Government was required to prove that Defendant constructively possessed the drugs. *United States v. Lawrence*, 788 F.3d 234, 240 (7th Cir. 2015). "Constructive possession is a legal fiction in which a person is deemed to possess contraband even without immediate physical control of the object." *Id.* (citing *Griffin,* 684 F.3d at 695). See also [206] at 16 (jury instruction regarding possession); Seventh Circuit Pattern Jury Instruction 4.13 (2012) (definition of possession). To prove constructive possession, the Government was required to establish that Defendant "knowingly had both the power and intention to exercise dominion and control over the [drugs], either directly or through others." *Lawrence*, 788 F.3d at 240 (citing *Griffin*, 684 F.3d at 695). The Government could "demonstrate the required nexus between [Melero] and the contraband by showing either" that Melero had "exclusive control" over the contraband *or* "a substantial connection to the contraband." *Id.* Since the Government's theory was that Defendant and Correa both had access to the apartment, the bedroom, and the locked box of narcotics—such that neither exercised "exclusive control" over them[3]—the Government was required to show that Defendant had a "substantial connection" to the narcotics.

At trial, the Government presented ample evidence establishing a substantial connection between Melero and the narcotics, including: "(1) Melero rented the unit, as supported by the

---

[3] The Government was not required to prove that Defendant was in sole possession of the drugs, because possession can be "exclusive or joint." *Id.* In other words, both Defendant and Correa "could have jointly possessed the contraband found in th[e] bedroom" of the apartment. *Id.*

rent checks and testimony from the owner of the unit, Melero's real estate agent, and the owner's real estate agent; (2) a copy of Melero's rent check for October 2011 was found on the floor in the living room in the unit (the seizure and arrests were on October 27, 2011); (3) Melero's birth certificate was found in the residence; (4) Melero's marriage certificate was found in the residence; (5) other items linked to Melero were found in the residence, including checks, divorce papers, and mail; and (6) Melero was on the street on 18th Street and Michigan directly below the condo at the time of the search." [236] at 5. Melero has failed to demonstrate that "no rational trier of fact" could have found based on this evidence, plus the presence of his fingerprints on some of the bags of narcotics recovered from the locked box, that he possessed all of the narcotics recovered from the apartment. *Griffin*, 684 F.3d at 694.

Finally, the Court is not convinced by Melero's argument that he is entitled to acquittal because there was no evidence that he had keys to the bedroom in Unit 702 or to the locked box that contained most of the narcotics. A rational trier of fact could infer based on the evidence presented at trial—including the presence of Melero's fingerprints on bags recovered from the locked box—that Melero had access. For instance, the jury might infer that the keys recovered from Correa belonged to Melero or were used jointly by Correa and Melero. Melero concedes as much in his reply brief, in which he argues that the "beeper and keys seized by the government" during their traffic stop of Correa "were an effect *belonging to Mr. Melero*." [237] at 5-6 (emphasis added). Therefore, the Court concludes that Melero is not entitled to a judgment of acquittal.

## III.  Conclusion

For the foregoing reasons, the Court denies Melero's consolidated motion [222] for a new trial and for a judgment of acquittal.

Dated: May 19, 2016

Robert M. Dow, Jr.
United States District Judge